**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:07-CR-47 PS |
| | ) | |
| DEMOND HARDIMON | ) | |

## OPINION AND ORDER

Demond Hardimon was dealing heroin for a long time, and he essentially admits as much. But he wasn't charged with distributing heroin; he was charged with conspiracy to distribute heroin, and he claims there was insufficient evidence to support that charge. A jury found otherwise and convicted him of one count of conspiracy to distribute in excess of one kilogram of heroin. In his present motion for a new trial and for judgment of acquittal he says the evidence was insufficient for him to have been found guilty of conspiracy since he only had a buyer-seller relationship with his buyers. He also argues that the government's indictment contained a fatal variance from the proof at trial in that the evidence did not demonstrate Hardimon's participation in a single, overarching conspiracy. There was plainly sufficient evidence that Hardimon had more than a buyer-seller relationship with those to whom he sold drugs. And although there was a variance between the conspiracy charged in the indictment and the one proved at trial, that variance was not fatal. Hardimon's motion is therefore denied.

## FACTUAL BACKGROUND

In April 2006, federal investigators uncovered a group of heroin users in Porter County, Indiana who acquired their drugs through a large, interconnected web of suppliers and distributors based in Chicago Heights and other Illinois cities. At trial, the government presented three individuals - Andy Foster, Matt Bishop, and Djuro Chris Higi (together, the

"Indiana Distributors") - as the main conduit between the higher-level Illinois heroin suppliers on the one hand, and the Indiana heroin buyers and end-users on the other.  Evidence showed that Hardimon sold heroin to all three of the Indiana Distributors, who then re-sold it to Indiana buyers, many of whom the distributors had introduced to heroin in the first place.

The Indiana Distributors also obtained much of their heroin from Jackie Hernandez and his daughter Jacqueline Hernandez, and used William Smith, Keith Moeller, James Brown, and Tariq Wilson as suppliers as well. Hardimon initially sold to the Indiana Distributors through Moeller and Brown, but he eventually sold to the Indiana Distributors directly.  This was not necessarily to the liking of Moeller and Brown, as they were cut-out as middlemen.  There was nothing directly connecting Hardimon to either Hernandez, Smith, or Wilson, other than the fact that they shared the Indiana Distributors as common buyers.

The initial indictment was filed in this case on March 22, 2007 against the Indiana Distributors, as well nine other co-defendants. [DE 12.] The list of defendants grew to seventeen by the time Hardimon was indicted on April 18, 2007. [DE 85.] All but two defendants pled guilty or were otherwise dismissed.  The two remaining defendants, Hardimon and Wilson, went to trial on March 3, 2008.  The trial lasted five days.  Most of the witnesses were fellow co-defendants who had already pled guilty – such as Bishop, Foster and Brown – as well as several of their Indiana buyers.  Witnesses described the system they used to contact and meet with Hardimon for their drug transactions.  Some of the testimony described Hardimon's transactions and stated they were made while the ultimate end-users were in his presence.  Foster testified that he bought heroin from Hardimon five days a week for over two years.  He bought upwards to 34 bags at a time.  Bishop was present fifty times when Foster bought from Hardimon.  Amber

Schultz, who worked with Foster in his distribution in Indiana, was also present on occasion when Foster bought his heroin from Hadimon.

The jury acquitted Wilson, but found Hardimon guilty as to Count One of the indictment, which charged conspiracy to possess with the intent to distribute in excess of one kilogram of heroin. Because all of the heroin transactions involving Wilson and Hardimon occurred in Illinois, neither Wilson nor Hardimon could be charged with any substantive distribution counts. The indictment as to both of them was therefore limited to one conspiracy charge. The jury was given a multiple conspiracy instruction as well as an instruction on the defense of buyer-seller. While there was substantial evidence that Wilson was guilty of distributing large quantities of heroin, the jury acquitted him nonetheless; it evidently found that he was not involved in a conspiracy (or that he merely had a buyer-seller relationship with the Indiana Distributors). By contrast, the jury found Hardimon guilty. Whether there was sufficient evidence for the jury to have arrived at that conclusion is what is now before the Court.

## DISCUSSION

**I.  Motion for Judgment of Acquittal.**

Federal Rule of Criminal Procedure 29(b) requires a court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A court may only grant a motion for judgment of acquittal if the record is devoid of evidence from which a rational jury could find that a defendant is guilty beyond a reasonable doubt. *United States v. Brown*, 328 F.3d 352, 355 (7th Cir. 2003); *United States v. Benjamin*, 116 F.3d 1204, 1206 (7th Cir. 1997). Because of this stringent standard, challenges to the sufficiency of the evidence rarely succeed. *United States v. Hill*, 187 F.3d 698, 700 (7th Cir. 1999).

3

### A. Agreement for Distribution

The government had the burden to convince the jury that Hardimon had more than a simple buyer-seller relationship with those co-defendants to whom he sold drugs. In a drug conspiracy case, the government must show the existence of "an agreement to commit a crime other than the crime that consists of the sale itself." *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993). Even if the buyer subjectively intends to resell the drugs, there is no conspiracy unless there is an agreement between the buyer and seller that further distribution will be made. *United States v. Brack*, 188 F.3d 748, 760 (7th Cir. 1999).

But a conspiracy can exist even without proof of a formalized agreement; it "can consist of an implicit understanding between the parties regarding the subsequent resale of drugs." *Id.* (quoting *United States v. Hall*, 109 F.3d 1227, 1232 (7th Cir. 1997)). This understanding may be shown through 1) transactions involving large quantities of drugs, 2) a standardized way of doing business over time, 3) sales on credit, 4) a continuing relationship between the parties, 5) the seller's financial stake in resale by the buyer, and 6) whether the parties had an understanding that the drugs would be resold. *United States v. Luster,* 480 F.3d 551, 556 (7th Cir. 2007); *United States v. Haywood*, 324 F.3d 514, 517 (7th Cir. 2003); *Brack*, 188 F.3d at 760. These factors are compiled into the Seventh Circuit Criminal Pattern Instruction No. 6.12, which was provided to the jury in this case.

The government provided several pieces of evidence that could convince a reasonable jury that there was an understanding that the heroin would be re-sold. Most strikingly, Hardimon admitted in his post-Miranda confession that he was aware that some of his Indiana Distributors, including Bishop, collected money from others before traveling to Illinois to buy

4

heroin from him.  Hardimon therefore knew that Bishop was buying heroin not just for himself, but for others, and that Bishop would re-distribute it to them when he returned to Indiana.  Hardimon's knowledge of this could also be inferred from the fact that Bishop, Foster and Higi often brought others with them on their trips to Illinois to buy heroin.  Although Hardimon would only deal with the Indiana distributors, it would have been rather obvious to him that the Indiana distributors weren't using all of the heroin themselves but were sharing it with their passengers  – which they were.

There was also testimony from Bishop that Hardimon delivered heroin to Moeller, another one of Bishop's suppliers at the same time, while Bishop and Moeller's other customers were present at Moeller's residence.  Bishop reported seeing this approximately twenty-five (25) different times.  In addition, another of Hardimon's customers, James Brown, testified that Hardimon approached some of Brown's customers in an attempt to cut Brown out as the middleman. Hardimon's attempt to "cut out the middleman" shows that he was aware that there were multiple layers to the distribution network.  While Hardimon argues that it is possible that he was simply trying to solicit business from individuals he knew to be heroin users, the other inference is equally plausible and that is the inference that the jury chose to draw which I will not second-guess.  *United States v. Murphy*, 406 F.3d 857, 861 (7th Cir. 2005)("Rule 29(c) does not authorize the judge to play thirteenth juror.").  From these separate pieces of evidence, a reasonable jury could conclude that Hardimon had an understanding that his product was to be distributed for resale.

Additional evidence was presented in support of the other factors used to determine if there was more than a buyer-seller relationship.   For example, one of the Indiana Distributors

5

(Foster) discussed standardized methods of calling Hardimon and standardized meeting locations. Other buyers, including Amber Shultz, Joanna Oshaben and Ryan Slicker, also testified as to Hardimon's standardized way of doing business. There was also testimony as to the continuing relationship between Hardimon and his customers. As discussed earlier, Foster described how during a two-year stretch he purchased heroin five times a week, regularly meeting with Hardimon to obtain about two-thirds of his product. Bishop, Oshaben, and Jessica Spillers painted the picture of similar relationships with Hardimon, ranging from seven months to three years. Another factor, the large quantities involved in the drug transactions, was addressed as well. For example, Foster testified to regularly buying eight (8) bags of heroin at a time from Hardimon, although that number had reached thirty-four (34) bags at its height. He also stated he was making trips to Hardimon's location to purchase heroin four or five times a week. Each bag represented one tenth of a gram, meaning that a reasonable jury could conservatively estimate that Hardimon sold approximately four (4) to five (5) grams of heroin a week, just to Foster alone. Over the two-year period which Foster stated he bought heroin directly from Hardimon, that amounts to approximately half a kilogram. With these large amounts, it would not be a stretch for any jury to conclude that Hardimon was aware of his customers' general plans for re-distribution.

In summary, Hardimon confessed to knowing that some of the money used to buy the heroin he sold was from individuals other than the Indiana Distributors. The government also presented evidence that Hardimon established standardized methods of doing business with his customers, including those who served as middlemen to redistribute the drugs, and that these relationships were regular and lasted over the course of several years. The relationship between

6

Hardimon and the Indiana distributors also involved large quantities of heroin which means that Hardimon could well have inferred that the Indiana Distributors weren't using it all themselves (which they weren't).  All of this could lead a reasonable jury to conclude that Hardimon was involved in more than a buyer-seller relationship.  It does not matter that the agreements between Hardimon and his mid-level distributors were implicit, or that there was no direct evidence regarding the co-conspirators' plans.  "If the prosecution presents enough circumstantial evidence to support, beyond reasonable doubt, an *inference* that the defendants agreed among themselves to distribute drugs, a jury would be justified in convicting these defendants of conspiring together." *United States v. Zarnes*, 33 F.3d 1454, 1465 (7th Cir. 1994)(quoting *United States v. Burrell*, 963 F.2d 976, 988 (7th Cir. 1992)(emphasis in original)).

In a sufficiency challenge, I must view the evidence in the light most favorable to the government, since it is the jury's job to interpret witness credibility.  *United States v. Khilchenko*, 324 F.3d 917, 919 (7th Cir. 2003); *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  Doing so, I cannot say that the record was so devoid of evidence as to prevent a reasonable jury from reaching the conclusion that Hardimon was guilty.

### B.     Fatal Variance

Hardimon also argues that there was insufficient evidence to support the jury's finding of a single conspiracy.  "A variance arises when the facts proved by the government at trial differ from those alleged in the indictment." *United States v. Stigler*, 413 F.3d 588, 592 (7th Cir. 2005). A defendant may obtain reversal of his conviction if he can establish that (1) the evidence presented at trial was insufficient to support the jury's finding of a single conspiracy, and (2) he was prejudiced by the variance from the charge in the indictment. *United States v. Mojica*, 185

7

F.3d 780, 786 (7th Cir. 1999).   A fatal variance claim is also treated as an attack on the sufficiency of evidence. *United States v. Hewlett*, 453 F.3d 876, 879 (7th Cir. 2006).

Count One of the indictment grouped Hardimon, along with sixteen (16) other individuals, as part of one conspiracy to distribute heroin.  The government presented the narrative that the single conspiracy centered itself around the core group of Indiana Distributors - Bishop, Higi, and Foster.  They obtained their product from several higher level suppliers in Illinois, of which Hardimon was one.  Hardimon objects that the evidence presented by the government did not show a common purpose, specifically that Hardimon had no interest in the success of the other high-level suppliers providing product to the Indiana Distributors.

The existence of multiple sub-conspiracies is not necessarily problematic to the government's case if they also belong to the greater single conspiracy charged in the indictment. "When an indictment charges a lone conspiracy, proof of other conspiracies at trial is not problematic if the evidence also establishes the charged conspiracy."  *United States v. Thomas*, 2008 WL 755297, at *2 (7th Cir. Mar. 24 2008); *see also, Hewlett*, 453 F.3d at 879 ("Even if the evidence at trial reveals the existence of multiple conspiracies, a variance is not fatal if a reasonable juror could have found beyond a reasonable doubt that the defendants were part of the single, charged conspiracy.")

The evidence here does not establish that Hardimon was part of the single overarching conspiracy alleged in the indictment.  This case is similar to *United States v. Bustamante,* 493 F.3d 879, 885 (7th Cir. 2007) where the Court addressed a "hub and spoke" or "wheel" conspiracy, which is "an arrangement in which a core conspirator . . . moves from spoke to spoke, directing the functions of the conspiracy." (quoting *United States v. Chandler*, 388 F.3d 796, 807

(11th Cir. 2004)). "For a hub and spoke conspiracy to function as a single unit, a rim must connect the spokes together, for otherwise the conspiracy is not one but many." *Bustamante*, 493 F.3d at 885. In *Bustamante,* three of the buyer/distributor defendants raised variance challenges, and the Court found that there was enough connective tissue between only two of them and their hub to support a single conspiracy charge. *Id*. at 885-87. The evidence showed that the first defendant phoned the supplier serving as the conspiracy's hub and advised him to warn other members about a possible law enforcement raid. *Id*. at 885-86. The second defendant offered the hub the use of his garage to store drugs, thereby assisting the other spokes. *Id*. In contrast, the government presented no evidence for a third defendant, Pena, to show that he was part of the greater conspiracy. *Id*. at 886-87. The Seventh Circuit held that the evidence against Pena was insufficient to prove that he participated in the hub-and-spoke conspiracy, noting that awareness of the conspiracy is not enough to prove that he participated in it and furthered its cause. *Id*.

      Similarly, there is no rim connecting Hardimon to many of the other suppliers in this case, making him most similar to Pena, the third defendant in *Bustamante*. As previously discussed, the evidence does support a finding of something more than a buyer-seller relationship between Hardimon and the Indiana Distributors. But that smaller conspiracy cannot be stretched into the larger one, simply because the Indiana Distributors had multiple sources of heroin. "[F]or such a conspiracy to exist, those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise." *Id.*, 493 F.3d at 885 (internal quotations and citations omitted). Here, there was simply no evidence linking Hardimon to the other heroin sources. Thus, rather than showing a unified purpose amongst co-conspirators, "the evidence demonstrated a hodgepodge of competing drug outfits trying to profit

at the expense of the other," and thereby establishing them to be "discrete conspiracies." *Thomas*, 2008 WL 755297, at * 3.

If anything, the evidence showed that the various sources of heroin for the Indiana Distributors were working against one another competing for the Indiana Distributors' business, albeit unknowingly. That's what makes this case similar to *United States v. Townsend*, 924 F.2d 1385, 1397 (7th Cir. 1991).  In *Townsend*, the evidence showed that defendant Diaz, a supplier of drugs to a distributor named Marquez, was aware that Marquez purchased drugs from other suppliers to assist in his drug deals.  *Id*.  But the evidence did nothing to suggest that Diaz was "in league" with the other suppliers, and instead showed that he was competing with them.  *Id*.  Here, as mentioned, the evidence shows that Hardimon was either uninvolved with the other prominent suppliers who were also co-defendants – i.e., Jackie Hernandez, Jacqueline Hernandez, William Smith, and Tariq Wilson – or he was in direct competition with them. *See also*, *Stigler*, 413 F.3d at 592-93 (finding fatal variance where evidence showed two separate conspiracies in counterfeit check scheme that happened to include one common player).

So there was a variance between the conspiracy charged in the indictment and that which was proved at trial.  But this is not the end of the discussion since Hardimon must also establish that he was prejudiced by the variance.  *Stigler*, 413 F.3d at 593.  The factors used to determine whether a variance prejudiced a defendant at trial include:

> [the] (1) surprise to the defendant resulting from the variance, (2) possibility of subsequent prosecution for the same offense, (3) likelihood of jury confusion as measured by the number of conspirators charged and the number of separate conspiracies proven, and (4) likelihood of jury confusion in light of the instructions given the jury limiting or excluding the use of certain evidence not relating to the defendant.

*Bustamante*, 493 F.3d at 887.

10

The only prejudice that Hardimon points to is the fact that the jury heard evidence regarding the drug sales of Jackie Hernandez, a supplier who sold more frequently and in larger quantities.  Hardimon argues that the presentation of this evidence, mostly through the testimony of recovering drug addicts,  "may have confused the jury as to what amounts were sold by which person."  But there is no reason to believe the jury was confused in the manner Hardimon suggests, or that they could not adequately determine the credibility of the witnesses.  In fact, there is only reason to believe otherwise, as the same jury sorted through the testimony, including the discussions of Jackie Hernandez's operations, to acquit the only other co-defendant at trial, Tariq Wilson.  Once again, this holding is consistent with *Bustamante* and *Townsend,* each of which found that evidence of "spillover" prejudice to be insignificant when compared to the strong evidence establishing that the defendants conspired to distribute drugs.  *Bustamante*, 493 F.3d  at 888 (finding no prejudice against defendant Pena attributable to jury confusion from variance, although remanding to district court to recalculate the sentencing guidelines); *Townsend*, 924 F.2d at 1411 (rejecting variance claim because of lack of jury confusion).

To sum up: Hardimon had more than a buyer-seller relationship with the Indiana Distributors, so he was guilty of conspiring with them to distribute heroin.  And while there may have been a variance between the conspiracy charged and the one proved at trial, the variance was not fatal.  Hardimon's motion for judgment of acquittal is therefore denied.

**II.  Motion for New Trial**

Federal Rule of Criminal Procedure 33(a) allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990). "But if the judge believes there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted – he has the power to set the verdict aside . . even if he does not think that he made any erroneous rulings at the trial." *Id.* (citation omitted). A new trial is in order where "trial errors or omissions have jeopardized the defendant's substantial rights." *United States v. Reed*, 986 F.2d 191, 192 (7th Cir. 1993). Hardimon does not offer any reasons to grant a new trial other than those sufficiency-of-evidence arguments raised in his Rule 29 motion. Those arguments have been rejected for the reasons already explained, and so Hardimon's Motion for a New Trial must be denied as well.

### III. Request to Disregard Government's Response

Hardimon's Reply also included a request that the Court disregard the Government's response brief because it was filed four days beyond after the deadline. While the courts do have the discretion to strike untimely briefs, I will not do so here. There is no apparent prejudice to Hardimon as a result of the late filing, and Hardimon has not attempted to explain how he may have been hurt by the four day delay. Nevertheless, the Government is warned that it must comply with all future deadlines or risk penalty. At the very least, it should perform the courtesy of requesting an extension if more time is truly needed.

**CONCLUSION**

12

For the foregoing reasons, Hardimon's Motion for Judgment of Acquittal or for New Trial [DE 329] is **DENIED**.

**SO ORDERED**.

ENTERED: May 28, 2008

<u>s/ Philip P. Simon</u>
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
